IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

BRIAN MICHAEL WATERMAN,

        Plaintiff,

v.                                                Case No. 18-3092-JWB-KGG (Lead Case)
                                                              & No. 18-3135-JWB-KGG

MICHELLE TIPPIE, *et al.*,

        Defendants.

## MEMORANDUM AND ORDER

This matter comes before the court on Defendants' motion for summary judgment. (Doc. 344.) Plaintiff was given an extension of time to respond and failed to do so. (*See* Doc. 350.) The matter is fully briefed (Doc. 345) and ready for decision. For the reasons stated herein, Defendants' motion is GRANTED.

### I. Facts and Procedural History

The following statement of facts is taken from Defendants' memorandum in support of summary judgment.[1] Factual disputes about immaterial matters are not relevant to the determination before the court. Therefore, immaterial facts and factual averments that are not supported by record citations are omitted.

Plaintiff was a pretrial detainee at the Cherokee County Jail (the "Jail") from May 2016 until January 2022. Plaintiff was briefly transferred to other jails but was primarily held at the Jail during this time. Throughout this time, Plaintiff was awaiting trial on charges of attempted first

---

[1] Because Plaintiff never filed a response, Defendants' statement of facts is treated as unopposed. But the court still looks to the factual allegations to determine whether they are supported by the record and are sufficient to establish that Defendants are entitled to summary judgment. *Reed v. Bennett*, 312 F.3d 1190, 1195 (10th Cir. 2002).

degree murder, aggravated kidnapping, aggravated battery, and aggravated burglary. Plaintiff was classified as a maximum custody inmate because of the offenses for which he was being held and his disciplinary history. (Doc. 345 at ¶¶ 1, 3.)

Between April 18 and May 4, 2017, Plaintiff was held in C-Pod. Plaintiff reported to Officer Gina Brumback on May 1 that other inmates in C-Pod were giving him trouble and calling him racist because of the tattoo across his chest which reads "White Pride." On May 3, Plaintiff sent a general request through the kiosk system asking to be re-classified and moved to B-Pod because of the racial problems he was having with other inmates in C-Pod. In that request, he threatened to sue the Jail if something happened to him. (*Id.* at ¶¶ 4–6.)

Also on May 3, Plaintiff sent a grievance to staff complaining about "these blacks" threatening him and making racial remarks. (Doc. 345-6.) Plaintiff felt the Jail was putting his life in jeopardy, failing to provide a safe environment, and leaving him in C-Pod in the hopes that he would be injured by the other inmates. Plaintiff never specifically identified which inmates were bothering or threatening him. The Jail granted Plaintiff's requests to be moved on May 4, but because of his maximum custody classification, he was moved to segregation rather than B-Pod. Plaintiff was in segregation from May 4 to May 9, when he was moved to E-Pod. (Doc. 345 at ¶¶ 7–9.)

Plaintiff attended Jehovah Bible study on May 14, 2017, after the rest of the group was finished. Plaintiff was not allowed to attend with the rest of the group because of his protective custody status. On May 15, Plaintiff attended church. Bible study was cancelled on May 23, so none of the inmates attended. Plaintiff attended church on May 28. On May 29, church was cancelled and none of the inmates attended. Plaintiff attended church on June 4. On June 12, the pastors who provide church services were not able to stay long enough to provide services to E-

Pod, where Plaintiff was housed. Plaintiff encouraged all the inmates in E-Pod to write complaints. (*Id.* at ¶¶ 11–16.)

On May 19, Plaintiff filed a grievance complaining that his "religious services have been cut in half." (Doc. 345-9 at 2.) Then on May 30, Plaintiff filed another grievance requesting to go to church with everyone else and arguing that his rights were being violated because his church services were cut in half. On May 31, Captain Tippie responded that incompatibles were not able to go to church together because of safety and security issues and that was why Plaintiff had been unable to attend certain church services. (Doc. 345 at ¶¶ 17–18.)

The next event relevant to this case occurred on October 15, 2017. Officer Anderson ordered all inmates to move away from the tables and stand by their doors for tray pickup at the end of their meal. Plaintiff continued to wipe off the tables and Officer Anderson again instructed him to go stand by his door. Plaintiff finally went to his door; Officer Anderson directed the officer in the control room to secure his door and lock him down for not following directions. When Plaintiff was informed that he was being locked down, he walked out and went to the kiosk. Plaintiff stated that he was going to use the kiosk and that he would lock down when he felt like it. After giving him a few minutes to use the kiosk, Officer Price asked him to return to his cell to lock down. Plaintiff was given several other chances to follow instructions and then Officer Price finally advised him that he needed to return to his cell to lock down or he would be taken to segregation. Plaintiff went back to his cell and then stated that Officer Price should come and take him to segregation. Officer Phillips completed a Jail Incident report and recorded violations for failure to follow directions, failure to lock down immediately, and for participating in or inciting a riot or facility disturbance. (*Id.* at ¶¶ 19–21; Doc. 345-10 at 1.)

3

Also on October 15, Officer Howard was conducting medication rounds in E-Pod when Plaintiff left his cell without being fully dressed. Officer Howard twice told Plaintiff that he needed to be fully dressed outside of his cell, and Plaintiff swore at him. Officer Howard wrote a Jail Incident report and noted violations for wearing uniform improperly while out of cell, failure to follow an officer's directions, and treating officers with disrespect. (Doc. 345 at ¶¶ 22–23; Doc. 345-11.)

Two days later, on October 17, Officer DeGroot, the disciplinary officer at the time, went to Plaintiff's cell to discuss the write ups Plaintiff had received on October 15 from Officers Howard and Phillips. Plaintiff saw Officer Phillips holding a property tote and asked Officer DeGroot if they were taking him to segregation. Officer DeGroot told him that was not the plan. Plaintiff tried to argue with Officer DeGroot about the discipline policy and whether Plaintiff was entitled to a hearing in front of the guards. Officer DeGroot informed Plaintiff that he had reviewed the camera footage related to the write ups. Then, Plaintiff became aggressive, arguing with Officer DeGroot about an incident that happened with another inmate. Plaintiff repeatedly stated that another inmate had called Officer DeGroot a rude explicit name to his face and was not sent to segregation. Officer DeGroot tried to explain that the other inmate did not call him that to his face and focus on the disciplinary reports written about Plaintiff. He then explained that he was going to place Plaintiff in administrative segregation for a minimum of 15 days, depending on Plaintiff's behavior. (Doc. 345-12 at 1.)

At that time, Officer DeGroot ordered Plaintiff to pack his stuff up so they could take him to segregation. He refused and continued arguing. Plaintiff got in Officer DeGroot's face and yelled sexual innuendos and explicit insults, stating that if he was going to have 15 days in segregation, he was going to earn them. Officer DeGroot asked Officer Phillips for her handcuffs

4

and ordered Plaintiff to place his hands behind his back. Even after the handcuffs were on, Plaintiff continued yelling obscenities and resisting the officers. The officers began walking him to segregation and met Captain Tippie in the hallway, where Plaintiff started calling her an inappropriate name. When they reached the segregation cell, Plaintiff tensed up as the officers advised him to go to his knees. Once the officers got him onto his knees in the cell, he started yelling about his hands and wrists. Captain Tippie looked at his hands and wrists, which appeared to be fine. Plaintiff continued to yell and call her names as the officers exited the cell and secured the door. (*Id.* at 2.)

In the morning on October 18, 2017, Plaintiff called Officer Phillips several vulgar names. He also asked Officer Phillips about the city she lived in, threatening that he would find her and her child after he got out of jail. Sergeant Manes observed this interaction via the camera in Plaintiff's cell and wrote a Jail Incident report about it. She noted violations for intimidation or coercion of fellow inmates or correctional staff, treating officers with disrespect or discourtesy, and disorderly conduct. (Doc. 345-17.)

Later that same day, on October 18, Plaintiff spread feces all over the walls of his cell while in segregation. Plaintiff stated that he was going to cover the entire cell in feces and that the officers were going to have to come in and get him. (Doc. 345-14.) Later that day, Plaintiff called to the control room via intercom and advised Sergeant McAfee that he was ready to clean his cell. Plaintiff informed the officers that he wanted the mop handle so he could beak it and beat the officers with it. The officers provided Plaintiff with disinfectant spray and rags. Plaintiff dumped out the disinfectant spray and filled the bottle with feces and water. He then put the spray nozzle back on and started spraying the mixture all over his cell. The officers consulted with Captain Tippie on what to do, then informed Plaintiff that until he gave the spray bottle back, he would not

be able to have any food. Plaintiff continued to taunt the officers to come into his cell and made obscene gestures towards the camera in his cell. (Doc. 345-16 at 1.)

Shortly thereafter, Plaintiff began ripping up the rags and trying to attach the pieces of rag to the fire sprinkler in his cell. Captain Tippie advised him that he would be charged $10.00 for the rags for the destruction of property. Plaintiff was unable to attach any of the rags to the sprinkler because they kept ripping. Eventually, Plaintiff dumped the water out of the spray bottle and let the officers know he was ready to clean his cell. (*Id.*)

Plaintiff stayed in segregation from October 17 to November 7, 2017. (Doc. 345-3 at 1.) Plaintiff told Officer Howard while he was in segregation on October 21 that he made the mess in his cell because he wanted to make "the worst mother fucking conditions" for the guards to come into every day. (Doc. 345-18[2] at 6:27–6:35.)

Plaintiff was residing in C-Pod on March 17, 2018, with an inmate who was a sex offender. Captain Tippie did not inform the inmates or the officers that this inmate was a sex offender because sex offenders are often attacked in jail if that information is made public. (Doc. 345-1 at 3.) Plaintiff indicated to Officer Phillips that he could not be around this other inmate, who he had reason to believe was a sex offender. Officer Phillips denied that there was a sex offender in the pod and informed Plaintiff that if he wanted to be segregated from the other inmates, he would have to be placed in segregation. Later that day, Plaintiff refused to come out of his cell for lunch because he felt the other inmates were going to "jump him" as soon as he went out into the day room. (Doc. 345-19 at 1.) Officer Phillips informed Plaintiff that his options were to go out into the day room for his lunch or to be moved into segregation for his protection, but he would not be able to bring his personal items into segregation. Plaintiff chose to stay in his cell and miss lunch.

---

[2] Doc. 345-18 is a placeholder for Exhibit S, a body camera video which was conventionally filed with the court. This citation refers to the video itself.

6

During lunch, he paced around in his cell and made intimidating gestures towards the other inmates who were in the day room. That afternoon, Plaintiff continued his agonizing behaviors, making a loud phone call to his mother where he mentioned being locked out of his cell with sex offenders and locked in a pod with child molesters. He also continued making intimidating gestures towards the other inmates. Officer Phillips and Officer West then took Plaintiff to segregation for his own protection. (*Id.* at 1–2.)

After Plaintiff was in segregation, Officer Phillips discovered from another inmate that there had been a physical altercation on or about March 14, 2018. Officer Phillips and Officer West went to C-Pod to talk to Cavin Williams, another inmate. After assuring Williams that the officers would not tell his pod what he told the officers, Williams explained that Plaintiff had gone into Williams' cell and punched him in the back of his head. Williams then grabbed Plaintiff's arms to keep him from hitting him again and that after a short period of wrestling, Plaintiff gave up and left. (Doc. 345-22.) Plaintiff was asked about this incident and whether he hit Williams in Defendants' requests for admissions. Rather than admit or deny the request, Plaintiff refused to answer, citing his Fifth Amendment privilege not to incriminate himself.[3] (Doc. 345-24 at 6.)

On April 21, 2018, Officer West went to segregation[4] to let Plaintiff have a shower and an hour outside of his cell. Plaintiff asked for another bottle of shampoo, stating that he must have left his bottle of shampoo in the shower yesterday. Officer West gave him an additional bottle of shampoo. Officer West then discovered that Plaintiff was hoarding items, including shampoo and fungal infection cream. Officer West wrote a Jail Incident report, noting violations for

---

[3] The court is allowed to draw an adverse inference against Plaintiff for invoking his Fifth Amendment right in a civil case. *MacKay v. DEA*, 664 F.3d 808, 820 (10th Cir. 2011) ("The Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them….") (alterations and quotations omitted).

[4] Plaintiff was not in segregation for this entire time period; he left segregation on March 31 and returned to segregation on April 14, 2018. (Doc. 345-30 at 4.) His placement in segregation on April 14 is not at issue.

7

accumulating extra authorized items (shampoo), stockpiling medications, and misrepresentation or manipulation for giving a false statement to Officer West. (Doc. 345-25.)

The next day, on April 22, Plaintiff sent a general request through the kiosk complaining about being written up for having the fungal infection cream in his cell. In that general request, Plaintiff used vulgar language and accused officers of being "perverts" and wanting to see the female inmates apply fungal infection cream in front of them. He also suggested that Officer Phillips was a lesbian and suggested that officers were doing something inappropriate with female inmates on the weekends. On April 24, after reviewing the general request, Captain Tippie informed Plaintiff that he would receive an additional 15 days of segregation for hoarding medication and for making harassing and sexually explicit comments about jail staff. (Doc. 345-26; Doc. 345-27 at 1.) Plaintiff stayed in segregation until May 8, 2018, when he was reassigned to B-Pod.[5]

These two cases[6] were filed by Plaintiff, pro se, in 2018 and later consolidated for judicial efficiency. The complaints are brought under 42 U.S.C. § 1983 alleging various constitutional violations by persons connected with the Jail. Specifically, Plaintiff complains he was denied religious services in May and June 2017 in violation of the First Amendment and that he was denied due process under the Fourteenth Amendment on four occasions when he was placed in administrative segregation. (Doc. 339 at 2.) Plaintiff originally brought suit against the Jail, David Groves, Michelle Tippie, Thomas DeGroot, Amanda Phillips, Kristin Wagnor, April Macafee, and Judah Ellis in Case No. 18-3092. (Doc. 1 at 1–3.) In Case No. 3135, Plaintiff brought suit against David Groves, Michelle Tippie, Thomas DeGroot, Kristin Wagner, Dr. Jonathan Manzer, Manzer

---

[5] Although Plaintiff makes a claim regarding placement in segregation on May 3, 2018, Plaintiff was already in segregation on that date because of the 15 days of segregation he received on April 24, 2018. (Doc. 345-30 at 4; Doc. 345-1 at 4.)
[6] The two cases are 18-3092-JWB and 18-3135-JWB.

Health Clinic, Ayrek Smith, Danny Davis, and Amanda Phillips. (Case No. 18-3135, Doc. 53 at 1–3.) Some of these claims were brought against Defendants in their official capacity and in their individual capacity. (*Id.*) A number of these Defendants have been dismissed from the consolidated cases. The remaining Defendants who now move for summary judgment are Thomas DeGroot,[7] Judah Ellis, Amanda Phillips, and Michelle Tippie. Defendants are sued in their individual capacities, as the official capacity claims were previously dismissed. (Doc. 57 at 4.)

**II.    Standard**

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is "material" when it is essential to the claim, and the issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor. *Haynes v. Level 3 Commc'ns*, 456 F.3d 1215, 1219 (10th Cir. 2006). The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim. *Thom v. Bristol—Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). The nonmovant must then bring forth specific facts showing a genuine issue for trial. *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). Conclusory allegations are not sufficient to create a dispute as to an issue of material fact. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). The court views all evidence and reasonable inferences in the light most favorable to the nonmoving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

---

[7] Curiously, Thomas DeGroot was dismissed from the case on June 26, 2019. (Doc. 57 at 5–6.) But the motion for summary judgment notes that he is a filer (Doc. 344) and the memorandum in support of the motion for summary judgment specifically references DeGroot (Doc. 345 at 28).

Where, as here, the motion for summary judgment is unopposed, the standard is slightly different. *United States v. Dawes*, 344 F. Supp. 2d 715, 718 (D. Kan. 2004). The court may not grant a motion for summary judgment only because it is unopposed; instead, "[i]t is the role of the court to ascertain whether the moving party has a sufficient basis for judgment as a matter of law." *Id.* (citing *E.E.O.C. v. Lady Baltimore Foods, Inc.*, 643 F. Supp. 406, 407 (D. Kan. 1986)). The court should be sure in making this assessment "that no undisclosed factual dispute would undermine the uncontroverted facts." *Id.*; *see also Reed v. Bennett*, 312 F.3d 1190, 1195 (10th Cir. 2002) ("The court should accept as true all material facts asserted and properly supported in the summary judgment motion. But only if those facts entitle the moving party to judgment as a matter of law should the court grant summary judgment.").

Qualified immunity exists to protect public officials acting in their individual capacities "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Once a defendant asserts the defense of qualified immunity, "the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Redmond v. Crowther*, 882 F.3d 927, 935 (10th Cir. 2018) (quoting *Koch v. City of Del City*, 660 F.3d 1228, 1238 (10th Cir. 2011)). These two prongs need not be addressed in order. *Crane v. Utah Dep't of Corr.*, 15 F.4th 1296, 1303 (10th Cir. 2021).

### III. Analysis

Defendants argue that summary judgment is appropriate because Defendants are entitled to qualified immunity and because there were no violations of Plaintiff's constitutional rights.

(Doc. 345 at 2.)  As the court previously noted, Plaintiff never filed a response to Defendants' motion for summary judgment.

### A.  Qualified Immunity

Defendants argue that they are entitled to qualified immunity because Plaintiff has sued Defendants in their individual capacities and Defendants did not violate Plaintiff's constitutional rights.  (Doc. 345 at 27–28.)  As previously noted, Plaintiff did not respond to Defendants' motion for summary judgment and thus, has made no arguments against qualified immunity.

Plaintiff has failed to produce any evidence or argument against qualified immunity because he failed to respond to Defendants' motion.  Accordingly, Plaintiff has failed to carry his burden, and the court will not shift the burden to Defendants.  *Babakr v. Fowles*, Case No. 20-2037-EFM, 2023 WL 183837, at *6 (D. Kan. Jan. 13, 2023) (citing *Smith v. McCord*, 707 F.3d 1161, 1162 (10th Cir. 2013)).  Defendants are entitled to qualified immunity.  Nevertheless, in an effort to be thorough, the court will continue to address the arguments presented as to whether there were any constitutional violations.[8]

### B.  Count I (Case No. 18-3092) & Count II (Case No. 18-3135)

These counts relate to Plaintiff's placement or continued placement in administrative segregation[9] at the Jail.  Plaintiff complains that his right to due process was denied when he was placed in administrative segregation without first receiving a hearing.  (Doc. 1 at 5; Case No. 18-3135, Doc. 53 at 4.)  He also complains that his placements in administrative segregation were improper pretrial punishment.  (Doc. 1 at 2.)

---

[8] It is not entirely clear from Plaintiff's complaint which counts are against which Defendants.  Further, as the court noted *supra* n. 7, Defendant Thomas DeGroot seems to have already been dismissed from the case, yet a count against him remains.  (Doc. 339 at 16.)  Accordingly, the court addresses the issues raised by count and in chronological order rather than by defendant.
[9] The term "administrative segregation" often "refers to solitary confinement." *Williamson v. Stirling*, 912 F.3d 154, 176 (4th Cir. 2018).

11

Defendants argue that Plaintiff was not subject to improper pretrial punishment but rather the Jail had a legitimate governmental interest in placing Plaintiff in administrative segregation to preserve internal order and to promote institutional security. (Doc. 345 at 13.) Defendants also argue, in the alternative, that Plaintiff was not denied due process and that even if Plaintiff was denied due process, his claims still fail because the outcome would not have changed. (*Id.* at 21–22.)

Pretrial detainees cannot be subject to punishment while they await trial. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979) ("For under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."). But pretrial detainees may be confined while they await trial and subject to the restrictions and conditions of the detention facility. *Id.* at 536–37. The question is whether a condition of the pretrial detainee's confinement is "punishment" or not.

"The determination of whether a condition of pretrial detention amounts to punishment turns on whether the condition is imposed for the purpose of punishment or whether it is incidental to some other legitimate government purpose." *Peoples v. CCA Detention Ctrs.*, 422 F.3d 1090, 1106 (10th Cir. 2005), *vacated in part on re'hg en banc*, 449 F.3d 1097. "Thus, if a pretrial detainee is placed in segregation for a managerial purpose and not for punishment, no process is required." *Hardesty v. Saline Cnty. Jail*, Case No. 19-3211-SAC, 2020 WL 1547823, at *3 (D. Kan. Apr. 1, 2020). A jail has a legitimate interest in segregating inmates from the general population for many reasons, including where there are threats to safety and security. *Cox v. Denning*, Case No. 12-2571-DJW, 2014 WL 4843951, at *24 (D. Kan. Sept. 29, 2014).

    1. *October 17, 2017*

On October 17, 2017, Plaintiff was taken to administrative segregation and placed there for 15 days. Defendants argue that this placement in administrative segregation was not punitive but that it was necessary for "the maintenance of safety, order, and discipline" at the Jail. (Doc. 345 at 17.)

Before Plaintiff was placed in administrative segregation, he refused to follow basic rules of the Jail – he refused to stand by his cell door while trays were picked up after mealtime and he refused to comply with several orders by Jail staff to go into his cell for lockdown. Additionally, he violated Jail rules when he exited his cell without being fully dressed. After Plaintiff was written up for these rule violations, Officer DeGroot, the disciplinary officer, went to Plaintiff's cell to review the writeups with him. Officer DeGroot confirmed in his report that he told Plaintiff he did not intend to place Plaintiff in segregation for these violations. But while Officer DeGroot was there to speak with Plaintiff, Plaintiff acted in a belligerent manner, using crude and sexually suggestive language and curse words and screaming in Officer DeGroot's face. Because of Plaintiff's completely inappropriate and aggressive behavior, he was taken to segregation. Plaintiff admitted that if he was going to get 15 days in segregation, he was going to earn them; the court finds that his behavior did indeed "earn" him time in segregation.

But the court wishes to make clear that despite Plaintiff "earning" time in segregation, the time in segregation was not a punishment for Plaintiff's poor behavior. Instead, it was necessary to further order and security within the Jail. Clearly, a jail cannot function if inmates act belligerently, getting in the faces of officers and screaming obscenities at them. To maintain order, Plaintiff had to be taken to segregation.

While Plaintiff was in segregation, he made a mess in his cell with his own feces and tried to spray the officers with a mixture of his feces and water. He eventually decided to clean up his

13

own mess, but he was kept in segregation for additional time because of his behavior. The Jail could not return Plaintiff to general population with other inmates while he was engaging in such behavior because the other inmates would not have tolerated that behavior which would put Plaintiff in danger. Further, Plaintiff's behavior was so aggressive and erratic that he was a danger to other inmates and guards if he was placed back in general population at that time. Both Plaintiff's initial and continued placement in segregation were to further the legitimate purposes of maintaining order and security at the Jail.

### 2. March 17, 2018

On this occasion, Plaintiff specifically requested to be taken to segregation because he believed another inmate in his pod was a sex offender. Officers ultimately complied with this request because the officers were worried the other inmates would kill Plaintiff if he was not taken to segregation because Plaintiff was agitating the other inmates. The Jail had an obligation to protect Plaintiff. *Bailey v. Andrews*, Case No. 2:16-3201-JAR, 2019 WL 1897842, at *6 (D. Kan. Apr. 29, 2019) (prison officials must "take reasonable measures to guarantee the safety of the inmates.") (internal quotation omitted). Plaintiff was not entitled to any due process before being taken to segregation at his own request.

While Plaintiff was in segregation, officers learned that Plaintiff had gone into the cell of another inmate and punched him in the head. To ensure the safety of both Plaintiff and the other inmates, Plaintiff was given 15 days in segregation. This was not a punishment for punching another inmate but rather was intended to ensure the safety of Plaintiff and the other inmates. This was a legitimate governmental reason – to promote safety and security in the Jail.

### 3. April 25, 2018

While Plaintiff was in segregation on this occasion,[10] officers found that Plaintiff was "hoarding" medication, keeping it inside his cell rather than using it as he was directed to do. He also lied to an officer to get an extra bottle of shampoo. After being written up for these violations, Plaintiff sent a general request through the jail kiosk system about the write up and included vulgar language and accused officers of mistreating or abusing female inmates. Captain Tippie notified Plaintiff that he would be receiving an additional 15 days of segregation for accumulating medication in his cell and for making the harassing and explicit comments about staff.

The Jail had a legitimate interest in controlling how medications are dispensed to inmates. *Todd v. Bigelow*, 497 F. App'x 839, 841 (10th Cir. 2012) (recognizing "legitimate penological interest in prevention of drug abuse"). It was proper for the Jail to continue to keep Plaintiff in segregation where it was clear that he was violating rules for medication and could have been a danger to himself or others. Further, the jail had a legitimate interest in preventing and discouraging inmates from sexually harassing officers or others. *Mauro v. Arpaio*, 188 F.3d 1054, 1059 (9th Cir. 1999) ("… there is no doubt that protecting the safety of guards in general is a legitimate interest, and that reducing sexual harassment in particular likewise is legitimate.").

    4. *May 3, 2018*

Plaintiff alleges in his First Amended Complaint that he filed a grievance on May 3, 2018 and was forced to do another 18 days in segregation. (Case No. 18-3135, Doc. 53 at 6.) Plaintiff was already in segregation on May 3, 2018, due to the incidents detailed above (hoarding medication and sending harassing and inappropriate messages through the kiosk). He did not

---

[10] As previously noted, Plaintiff's placement in segregation prior to April 25, 2018, is not at issue.

receive additional time in segregation on May 3 and was released from segregation on May 8. Accordingly, Defendants are entitled to summary judgment on this claim.[11]

### C. Count VI (Case No. 18-3092)

Plaintiff alleges that his religious beliefs were burdened in 2017 because he was not able to attend church services or Bible study with incompatible inmates. (Doc. 1 at 17.) He also alleges that on one occasion, he was prevented from attending services. (*Id.*) Defendants argue that these allegations do not show a substantial burden of Plaintiff's beliefs. (Doc. 345 at 24.)

"To state a valid constitutional claim, a prisoner must allege facts showing that officials substantially burdened a sincerely held religious belief." *Williams v. Hansen*, 5 F.4th 1129, 1133 (10th Cir. 2021). If the prisoner can show a substantial burden, "officials must identify a legitimate penological interest." *Id.* Then, the court balances certain factors to determine reasonableness of the penological interest or prison regulation. *Kay v. Bemis*, 500 F.3d 1214, 1219 (10th Cir. 2007).

Here, Plaintiff cannot show that his religious beliefs were substantially burdened. To begin, the court does not question that Plaintiff has sincerely held religious beliefs. Plaintiff alleges that on one occasion, he was prevented from attending religious services by Officer Ellis. (Doc. 1 at 17.) Defendants have not disputed that Plaintiff was prevented from attending religious services on one occasion.[12] Assuming then that this incident occurred, one incident is simply not enough to rise to the level of a substantial burden on Plaintiff's religious beliefs. *Hachmeister v. Kline*, Case No. 12-3263-SAC, 2013 WL 237815, at *5 (D. Kan. Jan. 22, 2013) ("… isolated or sporadic incidents are not sufficient to show a substantial burden."); *Strope v. Cummings*, 381 F. App'x

---

[11] The court has considered whether this reference to May 3 should have instead been a reference to placement in segregation on May 3, 2017. But Plaintiff was placed in segregation on May 4, 2017, not May 3, and he remained there for only three days until he was taken to a medical cell. (Doc. 345-3 at 2.) After two days in the medical cell, Plaintiff went back to E-Pod. (*Id.*) Thus, this May 3 reference likely does not reference 2017 and, as explained above, does not reference 2018.

[12] Defendants reference an affidavit of Judah Ellis which should be attached to the memorandum in support as Exhibit J. (Doc. 345 at 5.) Exhibit J was not attached to the memorandum.

878, 882 (10th Cir. 2010). And Plaintiff was otherwise able to attend church services or Bible study several times during May and June of 2017.

Plaintiff also alleges that he was restricted from practicing his religious beliefs when he could not attend church or Bible study with his "incompatibles." As discussed above, jail officials have an obligation to protect inmates. *Bailey v. Andrews*, 2019 WL 1897842, at *6. Plaintiff himself requested to be separated from these incompatible inmates because he felt threatened by them. Accordingly, he was not able to attend church services or Bible study with those inmates and was able to do so at a different time. Plaintiff has not shown that he had a right to attend services with these other inmates.

As to Plaintiff's complaints that sometimes his services were shortened, Defendants argue that shortened services are not a substantial burden. Plaintiff correctly notes that at times, services for all inmates were cancelled because the pastors who lead these groups were unable to come to the Jail. But that was not specific to Plaintiff – those services were cancelled for the Jail as a whole. And Plaintiff was still able to attend church and Bible study on several occasions. *Cf. McKinley v. Maddox*, 493 F. App'x 928, 933 (10th Cir. 2012) (plaintiff claimed "he was intentionally denied the right to attend all church services, either offsite or onsite at [the facility], for a month"; court found this was sufficient allegation of substantial burden).

The court finds that these incidents do not amount to a substantial burden on Plaintiff's sincerely held religious beliefs.

...

**IV.     Conclusion**

For the reasons stated herein, Defendants' motion for summary judgment is GRANTED. The clerk is directed to enter judgment in favor of Defendants.

IT IS SO ORDERED this 31st day of March, 2023.

                                                            __s/ John W. Broomes_____
                                                            JOHN W. BROOMES
                                                            UNITED STATES DISTRICT JUDGE